UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN


MERIT MEDICAL SYSTEMS, INC.,
    Plaintiff,                              Case No. 05-0040
                                                 Hon. Bernard A. Friedman
v.

ASPEN SURGICAL PRODUCTS, INC.,
    Defendant.
_____/

**OPINION AND ORDER**

**I.    INTRODUCTION**

Plaintiff, Merit Medical Systems, Inc. ("Merit") filed a patent and trade dress infringement case against Defendant, Aspen Surgical Products, Inc. ("Aspen"). Both parties manufacture and sell medical devices. At issue here is Merit's product, the "Backstop" and Aspen's product, the "Aspenbasin." These products are designed to collect waste fluids during medical procedures.

The parties have filed cross-motions for summary judgment. The court will decide the parties' motions without oral argument.

**II.    FACTS**

Merit has manufactured and sold the Backstop since 1993. Merit has a patent associated with its product, Patent No. 6,719,017 ("the '017 patent"). Aspen began designing its product in 2003. Aspen's 2003 product is referred to as the "old Aspenbasin." When Merit learned of the old Aspenbasin, it notified Aspen that the old Aspenbasin infringed the '017 patent. In response, Aspen discontinued its use of the old Aspenbasin and designed a different version, referred to

1

here as the "new Aspenbasin" or "Aspenbasin."

Both products are essentially, in simple terms, a rectangular blue basin with a clear, plastic, detachable lid. The clear plastic lid slopes downward toward its center, where it has a hole. The hole on the Backstop is surrounded by a spongy material, and the hole on the Aspenbasin is uncovered.

Aspen explains that its product is not sold directly to hospitals or doctors, but rather as part of a "kit" that doctors and hospitals purchase for use in medical procedures. Aspen further explains that it designed its product in response to a request for its customer, Medline Industries, which was looking for a lower cost alternative to the Backstop. Medline Industries packages such kits, which include the disposable products that doctors may need for a procedure, including items such as the Aspenbasin or the Backstop.

Aspen states that it learned of the '017 Patent in the fall of 2004, shortly before its launch of the old Aspenbasin. Aspen states that the '017 Patent, issued on April 13, 2004, was issued after Aspen had begun its design process for the old Aspenbasin. The '017 Patent describes a waste basin that has a "vent associated with the upper rim" of the basin." Aspen explains that while its early drawings for the old Aspenbasin included a vent, Aspen eliminated the vent as a result of the claims in the '017 Patent.[1]

Aspen began selling the old Aspenbasin in December 2004. Merit filed this suit shortly after, claiming that the old Aspenbasin infringed the '017 Patent and Merit's trade dress. Aspen subsequently made two changes to the old Aspenbasin. First, Aspen changed its product's color from light blue to dark blue. Second, Aspen lowered the retaining notch of its product, which

was a clearance for a snap fit to hold the clear plastic lid to the basin. Aspen claims that the new Aspenbasin's retaining notch now sits below the upper rim, and that the upper rim of the new Aspenbasin is completely flush, without a notch or recess. The retaining notch, in both the old and new Aspenbasins, allows gas to escape the basin.

### III.   SUMMARY JUDGMENT STANDARD

The Sixth Circuit explains that "summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Bell v. Ohio State University, 351 F.3d 240, 247 (6th Cir. 2003). Summary judgment rulings are a proper method to adjudicate infringement issues in patent cases. Avia Group International, Inc. v. L.A.Gear, Inc., 853 F.2d 1557, 1561 (Fed.Cir. 1988).

### IV.   ANALYSIS

Merit alleges that both the old Aspenbasin and the new Aspenbasin infringe Claims 22 and 42 of the '017 Patent. Both parties have filed motions for summary judgment. Merit seeks summary judgment on its contention that the Aspenbasin infringes Claim 22 of the '017 Patent. Aspen seeks summary judgment regarding Merit's contention in Counts I and II of its complaint that its Aspenbasin infringes Claims 22 and 42 of the '017 Patent. Aspen further seeks summary judgment on Counts III and IV of Merit's Complaint alleging infringement of Merit's trade dress in violation of Section 43(a) of the Lanham Act.

#### A.   The Patent Claims

A claim in a patent can be infringed by either literal infringement or infringement under

the doctrine of equivalents. Literal infringement exists if each of the asserted claims are read on, or found in, the accused item. To find infringement, the court must 1) construe the meaning of the claim(s) allegedly infringed ("claim construction"), and 2) read the claims onto the accused items. IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422 (Fed.Cir. 2000); Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 452 (Fed.Cir. 1985).

Whether a claim is infringed is a question of fact. However, when there is unrebuttable evidence of the make-up of the accused product, "the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." Athletic Alternatives v. Prince Mfg., 73 F.3d 1573, 1578 (Fed.Cir. 1996). Here, there is unrebuttable evidence of the make-up of both the accused product and the patented product. In fact, the parties have sent the court examples of both products so that the court may examine the products firsthand. Accordingly, the question of literal infringement may be determined through a summary judgment analysis.

Under the "all elements" rule of patent law, a claim is infringed upon only if an accused product contains all elements of an asserted claim. Johnston v. ICAC Corp, 885 F.2d 1574, 1577 (Fed.Cir. 1989). Claim construction, or determining the meaning of a claim, is a question of law for the court. Markman v. Westview Instruments, 517 U.S. 370, 390 (1996). The words of a claim are "generally given their ordinary and customary meaning." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir. 1996).

A court may consider both intrinsic and extrinsic evidence in construing a claim. Phillips, 415 F.3d at 1314. However, the Federal Circuit has held that in claim construction intrinsic evidence, such as the language of the claim, is more reliable than extrinsic evidence. Id.

4

at 1317.  Extrinsic evidence, such as the prosecution history, treatises, dictionaries and expert testimony are all potential sources of information that may be helpful in determining the meaning of a claim.  Phillips v. AWH Corp., 415 F.3d 1303, 1324 (Fed.Cir. 2005).  These sources may be considered so long as they are not used to contradict the meaning of a claim term that is unambiguous.  Id.  However, because patents are addressed to and intended to be read by those with skill in the pertinent art, a claim must be read as it would by a person skilled in the field of the invention. A person of ordinary skill in the art is deemed to read the claim term in the context of the entire patent, including the particular specification.  Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed.Cir. 1998).

       **1.**      **Claim 22**

Aspen and Merit agree that the old and new Aspenbasins satisfy all of the other limitations of Claim 22, except for the vent limitation.  Therefore, in order to find infringement of Claim 22, the court need only interpret the vent limitation.

Claim 22 of the '017 Patent states:

> A waste collection system comprising:
>
> a basin including at least one chamber configured to receive and retain fluids, the at least one chamber including a bottom surface and at least one sidewall extending substantially upward from the bottom surface to an upper rim;
>
> a first containment layer at least partially engaging the upper rim of the at least one chamber, the first containment layer including at least one aperture for receiving waste;
>
> and a vent associated with the upper rim of the at least one chamber.

Accordingly, in this analysis, the only phrase needing construction is "a vent associated with the upper rim of the at least one chamber."

In its interpretation the Court will consider the ordinary meaning of "vent." In the context of waste bins and other receptacles, the ordinary meaning of "vent" is "[a]n opening provided for the discharge of pressure or the release of pressure from tanks, vessels, reactors, processing equipment, and so on." McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed.), p. 2251.

The parties dispute in what way the vent is to be "associated" with the upper rim of the chamber. Aspen claims a vent associated with the clear plastic rim of the unit does not fall within the scope of Claim 22, and that the vent must be a part of the actual chamber, i.e., the basin.

Merit argues that the term "associated" means to be in a more or less close relationship, and does not mean that the vent need be actually connected to, or part of, the upper rim. Merit argues that the claim language itself, using the regular everyday meaning of "associated" should control, and not other claims, specifications or prosecution history. Merit further believes that the only limitation to the term "vent" is that it be an opening for the release of gases from the waste basin, regardless of how such vent is constructed.

In interpreting the phrase that the vent be "associated" with the upper rim, the Court will also consider the drawings contained within the '017 patent. The Court believes this is necessary in order to better understand what Merit intended when stating that the vent was to be "associated" with the upper rim. The Federal Circuit has held that such drawings are part of the specification and are relevant to claim construction. CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1153 (Fed.Cir. 1997). Here, the "vent associated with the upper rim of the at least one chamber," is illustrated in Figure 2 of the '017 Patent. Structure 82 in Figure 2 of the '017

Patent illustrates the vent, and shows that the vent is a recess that extends completely through the upper rim of the sidewall of the Backstop. While Merit argues that the drawing is meant for illustrative purposes only, and should not serve as a limitation to the claim, the court believes that the drawing is an important source in interpreting what Merit intended when stating that the vent is to be "associated" with the chamber. The drawing is clearly a further description of the very vague claim language.

In considering the above, the Court concludes that the term "vent," as used in Claim 22, is meant to be a recess that extends completely through the upper rim of the sidewall of the main chamber, and allows for the escape of gas.

The Aspenbasin does not contain such a "vent." The Court finds that the Aspenbasin, while containing an aperture by which the clear plastic lid connects to the main chamber, and which allows gas to escape, does not contain a "vent," as described in Claim 22. The aperture which makes up part of the Aspenbasin is not a recess that extends completely through the upper rim of the sidewall of the main chamber. In fact, upon first looking at the Aspenbasin, and attempting to describe the difference between the Aspenbasin and the Backstop, this Court's initial impression was that the aperture on the Aspenbasin made up part of the "inner rim" of the device, while that of the Backstop made up part of the "upper rim" of the device. Accordingly, the Court finds that the Aspenbasin does not infringe upon Claim 22 of the '017 Patent.

    **2.**    **Claim 42**

Aspen's motion contains a second argument that it is also entitled to summary judgment on Merit's Complaint regarding Claim 42 of the '017 Patent. Aspen argues that the Aspenbasin does not infringe on Claim 42 of the '017 Patent.

Claim 42 of the '017 Patent reads:

A method of collecting waste including fluid waste, the method comprising: providing a receptacle comprising at least one chamber configured to accept the fluid waste and comprising a base and at least one sidewall extending from the base to a top edge, a first sidewall of the at least one sidewall including a recess at the top edge and at least one containment layer at least partially engaging the top edge of the at least one chamber; delivering the fluid waste to the receptacle; and allowing the recess to release gases from the receptacle.

As explained above, and as observed simply by looking at the Aspenbasin, the Aspenbasin does not contain a recess at the top edge of the main chamber. The top edge of the Aspengasin is completely flush. Accordingly, the Aspenbasin does not infringe on Claim 42 of the '017 Patent.

**B.     The Trade Dress Claims**

In Counts III and IV, Merit alleges that the Aspenbasin infringes on Merit's trade dress, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. s.1125(a). Aspen seeks summary judgment on these claims. Proof of the trade dress infringement claim requires that a plaintiff show (1) that the allegedly appropriated features of the trade dress or product configuration are primarily non-functional, (2) that the trade dress or product configuration is distinctive or has obtained secondary meaning; and (3) that the trade dress of the two competing products is confusingly similar. Schreiber Mfg. V. Saft America, Inc., 704 F.Supp. 759, 768 (E.D.Mich. 1989). To avoid summary judgment, Merit must show a genuine issue of material fact as to each of these elements.

Trade dress protection and its resulting jurisprudence both protects a party's unique distinctiveness and promotes competition. As the Supreme Court has explained,

It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the

> product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. In these respects protection for trade dress exists to promote competition.

Traffix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28 (2001).

### 1. Functionality

The Lanham Act does not provide trade dress protection for features of a product that are functional. Traffix Devices, Inc, 532 U.S. 23 (2001).

Merit, as the party asserting trade dress protection, has the burden of proving that the matter sought to be protected is not functional. 15 U.S.C. s. 1125(a)(1)(B)(3).

Merit alleges that its trade dress consists of its product's shape, geometric proportions, color, and lid. Merit argues that the Backstop's shape and geometric proportions are not functional, and are not essential to the use or quality of its product. It argues that the Aspenbasin could have been made any number of different shapes, and would still function just as well in capturing and retaining waste liquids. Aspen, however, argues that the Backstop's shape is functional, pointing to the fact that doctors and medical professionals, when using the Backstop to collect liquid waste, often store the product on a square or rectangular tray. Aspen further argues, without support, that if its product were a different shape, medical professionals would be more likely to drop the receptacles. The Court finds these arguments unconvincing, and certainly not sufficient for it to grant summary judgment. The Court believes that whether the shape or geometric proportions of the devices is functional is a question of fact for the jury.

### 2. Secondary Meaning

Aspen next argues that the Backstop's design, shape and color are not distinctive, and lack secondary meaning. Merit bears the burden of providing evidence that creates a genuine

issue of material fact on this element.

The Sixth Circuit has established a seven-factor balancing test to determine whether secondary meaning has been established. Herman Miller v. Palazzetti Imports and Exports, 270 F.3d 298 (6th Cir. 2001). Secondary meaning may be shown through evidence of (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market place; and (7) proof of intentional copying. Id. at 311. Merit need not prove every factor, and no single factor is determinative. Id. at 312.

Of these factors, number seven argues most strongly in Merit's favor. This factor considers proof of intentional copying in determining whether secondary meaning is established. Proof of intentional copying creates a presumption of secondary meaning. Esercizio v. Roberts, 944 F.2d 1235, 1239 (6th Cir. 1991). The Sixth Circuit, in explaining this holding, has stated, "The evidence of intentional copying shows the strong secondary meaning of the [patented] designs because '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" Id. quoting Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F.2d 551, 558 (9th Cir. 1960).

Aspen has acknowledged that its initial intention, expressed in its early design documents, was to make its product "recognizable as a substitute for existing product on the market." Pltf. Exh. 8. Aspen's director of engineering, Mark Zyzelewski, has testified that it was Aspen's intention to make the Aspenbasin "recognizable" as a substitute to the Backstop by making it similar in appearance to the Backstop. Pltf. Exh. 5. In addition, Zyzelewski testified that it sent the Backstop, not the Aspenbasin, to its Chinese manufacturer to ensure that the

10

tooling estimate it received was to obtain an estimate for tooling a "nearly identical" product to what it wanted to manufacture.  Id.  These facts are sufficient to raise a question of fact for the jury regarding Aspen's intentional copying of the Backstop, and thus, the presumption of secondary meaning.

      3.      **Likelihood of Confusion**

The third element in the trade dress protection analysis is whether there is a likelihood of confusion between the two products.

In support of its motion, Aspen argues that the Aspenbasin is a much darker shade of blue than the Backstop.  It is true that the Aspenbasin is a different shade of blue than the Backstop.  However, it is not clear that a purchaser would necessarily equate a different shade of blue with a different manufacturer.  This is a question of fact for the jury.

Aspen also argues that the purchasers of the Aspenbasin and Backstop are sophisticated and unlikely to be confused about the source of the products.   Aspen explains that the purchasers of the products are "kit packers" who are third-party intermediaries that assemble a variety of products that a doctor may need into a kit for use for medical procedures.  Aspen explains that these customers are sophisticated buyers of medical supplies that would not be confused about the source of the products.  Once again, the court is not entirely convinced by this argument.  While Aspen argues that it only sells to three "kit packers," it does not contend that it intends to limit its sales to only those three purchasers in the future.  While its current customer base of three purchasers may be sophisticated, unless Aspen does not plan to try to increase its customer base, the Court can not be sure that all purchasers of its products are necessarily sophisticated.

The Sixth Circuit has enunciated six factors meant to guide the court in determining whether two products are confusingly similar.  Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 646 (6th Cir. 2002).  These factors, meant as guidance, include (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

Merit offers an analysis of each of these factors.  Aspen does not.  First, Merit addresses the strength of its trade dress, noting that the protection accorded a mark depends on the strength of the mark.  Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 339 F.Supp.2d 944 (W.D.Mich. 2004).  The stronger a mark, the greater the likelihood of confusion.  Gray v. Meijer, Inc., 295 F.3d 641 (6th Cir. 2002).  Success in the market, as well as advertising and promotional efforts are evidence of a strong mark.  Id.  Merit has been selling its product for twelve years, and has made approximately $19,000,000 in sales.  Lampropoulos decl. ¶ 10.  Merit has demonstrated market success, and a strong mark, creating the possibility a jury would find a likelihood of confusion between the Backstop and the Aspenbasin.

Second, Merit demonstrates the relatedness of the goods.  As discussed above, Aspen has acknowledged that its product was modeled very closely after the Backstop.  The goods are clearly related.

Third, the similarity of the marks is analyzed.  For purposes of summary judgment, this Court concludes that the trade dress of the two products are identical.  They are the same shape, close to the same size, have the same general appearance, and while different shades of blue,

share the same color scheme.

Fourth, Merit argues that there has been actual confusion between its mark and the Aspenbasin. Merit states that its own engineers actually thought the Aspenbasin was a Backstop when they first saw it. Aspen, in its reply brief, however, points out that the confusion occurred before it changed the light blue color of the Old Aspenbasin to the dark blue color of the New Aspenbasin. It claims that there has not been any confusion regarding the two products since the color change. This Court is not entirely convinced, and believes it is a question best left to the jury. In fact, even when preparing this opinion, the Court did not necessarily associate one shade of blue with a particular product, and often had to turn the products around and read the labels of the New Aspenbasin and the Backstop to determine which was which.

Fifth, in examining the relatedness of the marketing channels used, Merit points out that the parties compete directly for sales of their products. Both parties promote their product to Cath Labs, who purchase their products directly from kit packers. The marketing channels are directly related.

Sixth, the likely degree of purchaser care and sophistication is to be examined. Merit argues that a purchaser will be less likely to exercise care because the products are relatively inexpensive. Aspen argues that the purchasers are sophisticated purchasers of medical products that are likely to use a high degree of care in selecting the products. The arguments create a genuine issue of material fact.

Seventh, Aspen's intent in selecting its Mark is examined. As discussed previously, Aspen specifically intended to model its product after the Backstop. A question of material fact for the jury regarding this element is present.

Eighth, the court is to look at a party's likelihood of expansion of its business to compete with the other or to be marketed with the same consumers as the other. <u>Homeowners Group, Inc.v. Home Marketing Specialists, Inc.</u>, 931 F.2d 1100 (6th Cir. 2001). Aspen's president has testified that Apsen intends to begin selling its product through new channels, as well as maintaining its current sales methods. Pltf. Exh. 6. The possibility of a likelihood of expansion exists, and is therefore a question of fact for the jury.

## V.  CONCLUSION

Accordingly, for the reasons stated herein,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on Counts I and II is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on Counts III and IV is DENIED.


Dated: September 12, 2006                    __s/Bernard A. Friedman_____
       Detroit, Michigan                     BERNARD A. FRIEDMAN
                                             CHIEF UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 12, 2006, by electronic and/or ordinary mail.


                                             <u>s/Carol Mullins; Case Manager</u>_____